IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION


ANTHONY TRENT BARBOUR, #01474560 §

VS. § CIVIL ACTION NO. 4:11cv365

DIRECTOR, TDCJ-CID §


REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Petitioner Anthony Trent Barbour, an inmate confined in the Texas prison system, proceeding

with the assistance of counsel, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. §

2254. The petition was referred to the undersigned United States Magistrate Judge for findings of

fact, conclusions of law, and recommendations for the disposition of the case pursuant to 28 U.S.C.

§ 636 and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to the

United States Magistrate Judge.

Background

Petitioner is challenging his Lamar County conviction for injury to a child, Cause Number

21634. On November 9, 2007, a jury found him guilty and sentenced him to twenty (20) years of

confinement. He was granted an out-of-time appeal, and the Sixth Court of Appeals affirmed his

conviction on January 27, 2010. *Barbour v. State*, No. 06-00092-CR (Tex. App.–Texarkana, 2010).

Petitioner concedes that he did not file a Petition for Discretionary Review. However, he filed a state

post-conviction application for habeas corpus relief on April 11, 2011, which the Texas Court of

Criminal Appeals denied without written order on May 25, 2011.

The present petition for a writ of habeas corpus was filed on June 16, 2011. Petitioner asserts that he is entitled to relief because the evidence is insufficient to sustain his conviction and because his trial counsel was ineffective. Respondent filed a Response, asserting that Petitioner's issues are without merit. Petitioner did not file a Reply.

<u>Statement of Facts</u>

The Sixth Court of Appeals summarized the facts of the case:

Paramedic Robert Cody rushed to respond to the dispatch of an eight-year-old boy in distress. When he arrived at the home of Lisa Hurst, he found her son C.S. unresponsive and on the verge of death. His agonal respirations were slow and erratic, and he was blue, due to the lack of oxygen. After noting that Barbour, his caretaker for the day, was nowhere to be found, Cody intubated C.S. and raced to the Paris Regional Medical Center (PRMC) emergency room.

On arrival, emergency room nurse Karen Vrba noted C.S.'s core temperature was an extremely low 87.5 degrees and his blood pressure was "pretty low." She was shocked to find C.S.'s body covered with excessive fresh and older bruising. C.S. was bruised on both sides of the forehead, his eye, neck, right buttock, right hip, knee, lower back and down the thighs, shins, and legs. Additionally, there was bruising above the rectum, "right above the penis and scrotum ... linear bruising, along the right side of his scrotum ... [and] bruising to the tip of his penis." After taking his vital signs and charting the bruises, Vrba ran blood tests, obtained a urine specimen via catheter, and sent the samples to the laboratory for testing. When questioned, Hurst admitted to whipping the boy with a belt a few days before because he had run away. Barbour did not show up at the hospital and could not be questioned. When probed to offer an explanation of his condition, Hurst suggested C.S. had fallen and hit his head earlier in the day. A CAT scan ruled out brain trauma.

C.S.'s pediatrician, Ed Clark, took over and found C.S. "had been beat ... [i]t was beyond spanking." Clark reviewed the PRMC toxicology report and was amazed to find it was positive for "Fentanyl, which is a very potent opioid ... [and][m]orphine, which is also an opiate," although none had yet been given to C.S. PRMC was able to stabilize C.S., but he required transfer by helicopter to Children's Medical Center (CMC).

C.S. was in critical condition when he arrived at CMC in Dr. Matthew Cox's care.

Dr. Cox also ran tests which confirmed PRMC's positive result for opiates. C.S. slipped into a coma and required aggressive resuscitation. Cox documented "[t]he pattern of bruising ... was consistent with being abused." Finally, Barbour arrived at CMC around 5:30 the following morning and met with Dr. Cox. Barbour said C.S. was spinning around to make himself dizzy and fell on his buttocks and forehead simultaneously around 10:00 a.m. Barbour explained that he did not notify Hurst, who was at work until thirty minutes before the ambulance was called, because C.S. was active and playful after the fall. Cox concluded Barbour provided "inadequate explanation for [C.S.'s] hospitalization." CMC continued to treat C.S.'s life-threatening condition and notified the police and the Department of Family and Protective Services of the possible abuse.

Fortunately, C.S. awoke from the coma and family was allowed to visit him. Intensive care unit nurse Debbie Kay Smith monitored his vital signs. Smith noticed a curious pattern in C.S. Whenever Barbour would enter the room, his "blood pressure ... would go up by 20 points every time." She could tell C.S. was uncomfortable, especially when left alone with Barbour because "[h]is heart rate was going up; his blood pressure was going up," and he did not have this physiological reaction to anyone else. At one point, C.S. requested to speak to Hurst. "[A]s she walked in the room, he was going to start to try to talk to her. And then when [Barbour] got into his line of vision, ... he had tears well up in his eyes. And he says, oh, oh, never mind."

Detective Shane Boatwright responded to the report provided by Dr. Cox. Again, Hurst admitted to spanking C.S., but only three times. Next, Boatwright spoke to Barbour, who was described as "just kind of bubbly ... it was just kind of rapid, rapid fire talking to me ... he was eager to talk." He "didn't appear to be upset or ... even really concerned." Barbour said "he had been spinning the kids around and, like in a circle, and that he and [C.S.] had both gotten dizzy, said that [C.S.] had fell down, said he sort of hit his butt and his head on the floor simultaneously." C.S. complained of a headache a few hours later. Barbour then claimed it was normal for C.S.'s lips to turn purple on occasion. He told the detective that he was a weak disciplinarian and that the bruising on the scrotum might have occurred when he put C.S. in the shower. Boatwright concluded there were discrepancies in Barbour's story.

After the interview, C.S.'s grandfather asked Boatwright to come to C.S.'s room "because [C.S.] was trying to talk and that [Barbour] was trying to keep him from it." Boatwright cleared the room of family and interviewed C.S. in the presence of nurses and another detective. C.S. stated during the interview that Barbour had given him a yellow liquid that made him feel dizzy and that he did not remember anything after ingesting the liquid. C.S. stated Barbour hit him with a switch two nights before because he had wet the bed. He described how Barbour put him between a mattress and a box spring and laid on the bed, making it hard for C.S to breathe. Barbour

would spank him with a belt and a wooden spoon. C.S. said Barbour told him to lie to the officers and say he had fallen off a bike if they asked him what happened. After hearing C.S.'s statement, Boatwright looked for Barbour to continue with questioning, but he had left the hospital. Hurst claimed Barbour left to get something to eat, but Barbour said he was visiting a friend.

The State prosecuted Barbour on two counts of injury to a child, that he intentionally or knowingly caused serious bodily injury to C.S. "by administering to him or exposing him to a substance that contained morphine or heroin," and "by hitting or striking him with a wooden paddle or spoon or with a belt."

At trial, the jury heard from C.S., who said Barbour was "[s]winging me around by my ankles and threw me into a coffee table" causing him to pass out. C.S. did not hurt from the accident, but Barbour "gave me some yellow stuff ... [i]n a spoon" that made him feel dizzy. C.S. went into further detail about his abuse and started by saying Barbour "treated [him] pretty good in the daytime but then at night he would" wake him up and "beat [him]" in the back yard or in the shop in the yard. The beatings occurred at least twenty times. Barbour would hit C.S. with extension cords, belts, tree branches, or a wooden spoon. C.S. would be beat in the legs, on his "private," and "bottom." C.S. told the jury he "was so scared of peeing the bed" because Barbour "would put clothes pins on my private" and would hit him in his "private parts." C.S. claimed he told his mother about the beatings once, but she did nothing. C.S. also said his mother would beat him with a belt when he got a spanking. He testified that the beatings by Barbour led to bruising.

At trial, Vrba testified that C.S.'s white blood count was elevated, indicating trauma or infection, and that the bruises to C.S. could be caused by something long and narrow like an extension cord. Dr. Clark believed that the bruising to the private area would be consistent with being beaten with a wooden spoon. He countered Barbour's explanation that C.S. had fallen on his head and buttocks simultaneously by pointing out the injuries to both sides of the head, which would not be consistent with one fall to the ground. Dr. Cox believed the bruising to the neck was caused by someone grabbing C.S. by the neck. The linear bruising was "consistent with being struck with an object ... at least six discreet [sic] little areas ... relative fresh bruises.... There were some bruises on his leg that ... raised clear concerns that there were older bruises as well."

The defense theory at trial opined the possibility that Hurst had inflicted the bodily injury to C.S. Hurst was a nurse for an assisted living home. Because she oversaw the medication room, she had access to liquid morphine. At trial, Hurst denied taking any action which would cause bruising to C.S.'s private areas. She went to work at 5:45 a.m. on the day in question and returned home before 8:30 p.m. Hurst told the jury she called the ambulance, which arrived at 9:00, immediately after checking on C.S.

She had left C.S. in Barbour's care for the day. Hurst denied giving C.S. Benadryl or morphine.

Toxicologist Chris Heartstill testified that morphine is metabolized by the body within ten to twenty hours. Based on his testing, which occurred at 11:00 a.m. the day after C.S. was brought to the hospital, Heartstill stated it was reasonable to conclude the morphine was given to C.S. around noon the day before. Again, C.S. was in Barbour's exclusive care when the morphine could have been administered. Dr. Cox explained that morphine will "kick in within half an hour to an hour, and it has relatively quick symptoms."

These symptoms were witnessed by Matthew Sugg, C.S.'s eight-year-old friend, who went to C.S.'s home around 4:00 or 5:00 p .m. on the day of the incident. Sugg testified Barbour opened the door, let him in, but told him C.S. was asleep. Sugg went to C.S.'s room anyway and saw that he was sleeping and "his eyes and lips were bluish." He witnessed Barbour "[s]quirting [C.S.] in his face with" a water bottle. C.S. did not wake up. This testimony was contrary to Barbour's story to Boatwright that C.S. was alert and playful after the alleged fall.

Chris Upchurch was in jail with Barbour. Upchurch testified Barbour

> told me that his girlfriend was a nurse and that she was stealing drugs from the nursing home or taking drugs from the nursing home from the elderly patients. And they were taking them and either selling them—using some and selling some of the others.... Then he told me that the reason he was there is that he sold or gave some liquid morphine to a cousin of hers or relative of hers and they took—they drank it and it caused them to go into a coma and had a real adverse effect upon them.... He said, stupid son-of-a-bitch drank the liquid morphine and had an adverse effect on him and went into a coma and almost died.

After hearing the evidence, the jury convicted Barbour on both counts of injury to a child.

*Barbour v. State*, slip op. at 2-8.

## Federal Habeas Corpus Relief

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1354, 1367 (5th Cir. 1993). Federal habeas

corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 479-80, 116 L. Ed.2d 385 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996). In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

The prospect of federal courts granting habeas corpus relief to state prisoners has been further limited by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The provisions of Section 2254(d) provide that an application for a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See Williams v. Taylor*, 529 U.S. 362, 402-03, 120 S. Ct. 1495, 1517-18, 146 L. Ed.2d 389 (2000); *Childress v. Johnson*, 103 F.3d 1221, 1224-25 (5th Cir. 1997). The statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts. *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

A decision by a state court is "contrary to" the Supreme Court's clearly established law if it "applies a rule that contradicts the law set forth in" the Supreme Court's cases. *Williams*, 529 U.S. at 405-06, 120 S. Ct. at 1519-20. A federal court's review of a decision based on the "unreasonable application" test should only review the "state court's 'decision' and not the written opinion explaining that decision." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*). "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas corpus court may not issue the

writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411, 120 S. Ct. 1522-23. Rather, that application must be objectively unreasonable. *Id.* 529 U.S. at 409, 120 S. Ct. at 1521. The standard is satisfied only if "reasonable jurists considering the question would be of one view that the state court ruling was incorrect." *Davis v. Johnson*, 158 F.3d 806, 812 (5th Cir 1998) (internal quotation marks and citations omitted).

The trial court's factual findings are entitled to a presumption of correctness unless the petitioner can rebut the presumption with clear and convincing evidence to the contrary. *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001). A federal district court must be deferential to state court findings supported by the record. *See Pondexter v. Dretke*, 346 F.3d 142, 149-152 (5th Cir. 2003). The AEDPA has modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas "retrials" and to ensure that state court convictions are given effect to the extent possible under law. *Beel v. Cone*, 535 U.S. 685, 693, 122 S. Ct. 1843, 1849, 152 L. Ed.2d 914 (2002); *see Williams*, 529 U.S. at 404, 120 S. Ct. at 1519. A state application that is denied without written order by the Texas Court of Criminal Appeals, as in the present case, is an adjudication on the merits. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than the merits). Additionally, federal habeas relief is foreclosed if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed.2d 640 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288, 109 S.

Ct. 1060, 103 L. Ed.2d 334 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722, 123 L. Ed.2d 353 (1993).

In the context of § 2254(d), the deferential standard that must be accorded to counsel's representation must also be considered in tandem with the deference that must be accorded state court decisions, which has been referred to as "doubly" deferential. *Harrington v. Richter,* 526 U.S. 86, 131 S. Ct. 770, 788, 178 L. Ed.2d 624 (2011). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*. "If the standard is difficult to meet, that is because it was meant to be." *Id*., 526 U.S. —, 131 S. Ct at 786. Section 2254(d), as amended by AEDPA, "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this court's precedents. It goes no farther." *Id*. "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id*.; *see also Morales v. Thaler*, 714 F.3d 295, 302 (5th Cir. 2013). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 526 U.S. —, 131 S. Ct. at 784.

AEDPA also states that the state court's factual findings "shall be presumed to be correct"

unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254( e)(1). This presumption of correctness also applies to unarticulated findings that are necessary to the state court's conclusions of mixed law and fact. *Valdez*, 274 F.3d at 948 n. 11. This presumption is especially strong where, as in this case, the trial judge and the state habeas judge are the same. *Miller-El v. Johnson*, 261 F.3d 445, 449, 454 (5ᵗʰ Cir. 2001) (citing *Clark v. Johnson*, 202 F.3d 760, 764, 766 (5ᵗʰ Cir. 2000)).

Further, the evidence upon which a petitioner would challenge a state court fact finding must have been presented to the state court, except for the narrow exceptions contained in § 2254(e)(2). Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, " it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would not be helpful to a federal habeas petitioner. 28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). If a habeas petitioner failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). Failing to meet this standard of diligence will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. *Williams*, 529 U.S. at 436, 120 S. Ct. at 1490. Even if a petitioner can meet the foregoing standard, it is within this court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits.

*Clark v. Johnson*, 227 F.3d 273, 284-85 (5th Cir. 2000).

Exhaustion of State Remedies and Procedural Bar

Section 2254 does not allow a petitioner to file a petition for writ of habeas corpus unless he is "in custody" and has exhausted his available state remedies. 28 U.S.C. § 2254(b)(1). A state prisoner must exhaust all remedies available in state court before proceeding in federal court unless circumstances exist that render the state corrective process ineffective to protect the prisoner's rights. 28 U.S.C. § 2254(b), ( c). In order to exhaust properly, he must "fairly present" all of his claims to the state court. *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512, 30 L. Ed.2d 438 (1971). In Texas, all claims must be presented to and ruled on by the Court of Criminal Appeals of Texas (CCA). *Richardson v. Procunier*, 762 F.2d 429, 430-31 (5th Cir. 1985); *Deters v. Collins*, 985 F.2d 789 (5th Cir. 1993). This exhaustion doctrine was judicially crafted on federalism grounds to protect the state courts' opportunity to confront and resolve initially any constitutional issues arising within their jurisdiction and also to limit federal interference in the state adjudicatory process. *Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 489, 93 S. Ct. 1123, 1127, 35 L. Ed.2d 443 (1973). Finally, if one or more of the petitioner's claims is exhausted and one or more of the claims is unexhausted, it is a "mixed" petition, and the entire petition may be dismissed for failure to exhaust state remedies. *Rose v. Lundy*, 455 U.S. 509, 510, 192 S. Ct. 1198, 1199, 71 L. Ed.2d 379 (1982).

In the present case, one of Petitioner's claims is procedurally barred. He asserts that the evidence is insufficient to support his conviction. This claim is unexhausted because Petitioner failed to raise it on PDR and then he failed to properly raised it in his state application for writ of habeas corpus. By raising the claim in his federal petition for habeas corpus relief, he has bypassed

10

the state courts. However, if Petitioner were to present the claim to the state court, it would now be considered procedurally barred. Petitioner's claim, thus, is also barred from federal habeas review under the federal procedural default doctrine. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995), *cert. denied*, 515 U.S. 1153, 115 S. Ct. 2572, 132 L. Ed.2d 823 (1995) (the Texas abuse of the writ doctrine is an adequate procedural bar for purposes of federal habeas review). The procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Id*.; *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Petitioner has failed to overcome the procedural bar by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Fearance,* 56 F.3d at 642; *Finley*, 243 F.3d at 220. Accordingly, the claim concerning sufficiency of the evidence is procedurally barred from federal habeas review.

It is also well-settled that sufficiency of the evidence is not cognizable in a post-conviction writ of habeas corpus in Texas. *Ex parte Williams*, 703 S.W.2d 674, 677 (Tex. Crim. App. 1986). The Fifth Circuit has also recognized the same state procedural bar. *West v. Johnson*, 92 F.3d 1385, 1398, n. 18 (5th Cir. 1996) (sufficiency of the evidence may be raised on direct appeal, but not in a habeas corpus proceeding). Thus, the claim is otherwise procedurally barred unless Petitioner has demonstrated cause and prejudice or a miscarriage of justice. *Coleman*, 501 U.S. at 750, 111 S. Ct. at 2565. Petitioner has failed to allege or demonstrate cause and prejudice or that he is actually innocent of the crime. Consequently, this claim is procedurally barred from review.

Even it was not procedurally barred, a review of the record shows that Petitioner has failed to meet his burden. He specifically argues that the toxicologist's testimony was not definitive as to

when the morphine was given to the child and when the blood sample was taken; thus, leaving open the possibility that the morphine could have been given at a time when the child was in his mother's sole custody and control. He also alleges that the testimony of his fellow inmate should not be considered an admission or jailhouse confession. As shown in the appellate court's opinion, the urine and blood sample was taken at 11:00am on July 6, 2005. Dr. Matthew Cox, C.S.'s physician at Children's Medical Center testified that he personally obtained the urine and blood sample, put them in the correct tubes, and then sealed the box with the necessary tape. He testified that he gave the specimen to Sergeant Boatright who took it to SWIFS. Debbie Smith, the nurse that administered C.S.'s morphine at the hospital, verified that she did not give any morphine to C.S. until after Dr. Cox did his "slew of tests." The toxicologist then explained that the morphine in the urine specimen would be consistent with a twenty hour time span from the time when the drug was ingested. There was no evidence that anyone other than Petitioner was caring for C.S. during the ten to twenty hour span prior to C.S. ingesting the morphine. Additionally, C.S. testified that Petitioner gave him a yellow liquid on the day he went to the hospital, which made him feel dizzy. C.S. also testified to Petitioner beating him with a switch, an extension cord, a wooden spoon, and a belt. He testified Petitioner would put clothes pins on his "private." He testified that Petitioner beat him regularly at nighttime.

Additionally, the appellate court considered the legal and factual sufficiency of the evidence:

**II. Legally and Factually Sufficient Evidence Supported the Jury's Verdict**

**A. The Hypothetically Correct Jury Charge**

Our analysis of whether the evidence is legally and factually sufficient is measured against the elements of injury to a child with the same kind of analysis as that applied in the test for a hypothetically correct jury charge for the case.[FN1] *Malik v. State,* 953

12

S.W.2d 234, 240 (Tex. Crim. App.1997); *see also Grotti v. State,* 273 S.W.3d 273, 280 (Tex. Crim. App.2008). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik,* 953 S.W.2d at 240. It is used to evaluate both legal and factual sufficiency. *Grotti,* 273 S.W.3d at 281.

> FN1. *Malik* controls "even in the absence of alleged jury charge error." *Gollihar v. State,* 46 S.W.3d 243, 255 (Tex. Crim. App.2001).

Barbour was indicted for intentionally or knowingly causing serious bodily injury to a child in violation of Section 22.04(a)(1) of the Texas Penal Code. TEX. PENAL CODE ANN. § 22.04(a)(1) (Vernon Supp.2009). Under a hypothetically correct charge in this case, the jury was required to find, beyond a reasonable doubt, that: (1) Barbour; (2) intentionally or knowingly; (3) caused C.S., a child; (4) serious bodily injury. *Id.* The degree of harm to the child (serious bodily injury versus bodily injury), and the intent requirement (intentionally or knowingly versus recklessly or with criminal negligence), determine the grade of the offense. TEX. PENAL CODE ANN. § 22.04(e) (Vernon Supp.2009). Serious bodily injury is "bodily injury that creates a substantial risk of death." TEX. PENAL CODE ANN. § 1.07(46) (Vernon Supp.2009).

Also, injury to a child is a result oriented crime because the focus of the *mens rea* is on the result of the conduct, not the conduct itself. *Haggins v. State,* 785 S.W.2d 827, 828 (Tex. Crim. App.1990); *Patterson v. State,* 46 S.W.3d 294, 301 (Tex. App.-Fort Worth 2001, pet. ref'd); *Banks v. State,* 819 S.W.2d 676, 678 (Tex. App.-San Antonio 1991, pet. ref'd). "What matters is that the conduct (whatever it may be) is done with the required culpability to effect the *result*." *Alvarado v. State,* 704 S.W.2d 36, 39 (Tex.Crim.App.1986); *see Dunn v. State,* 13 S.W.3d 95, 97–98 (Tex.App.-Texarkana 2000, no pet.). Thus, "it is not enough for the State to prove that [Barbour] *engaged in conduct* with the requisite criminal intent, the state must also prove that [Barbour] *caused the result* " intentionally or knowingly. *Delgado v. State,* 944 S.W.2d 497, 498 (Tex.App.-Houston [14th Dist.] 1997, writ ref'd); *Lee v. State,* 21 S.W.3d 532, 540 (Tex.App.-Tyler 2000, pet. ref'd) (citing *Cook v. State,* 884 S.W.2d 485, 490 (Tex.Crim.App.1994)). It is this intent to cause the result that is the focus of Barbour's appeal.

For this offense, Barbour acted intentionally if it was his "conscious objective or desire to ... cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon Supp.2009). He acted knowingly if he was "aware that his conduct [was] reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b) (Vernon Supp.2009).

**B. The Evidence Was Legally Sufficient to Support the Verdict**

The requirement of legal sufficiency confirms that a fact question was raised by the evidence. *Clewis v. State,* 922 S.W.2d 126, 133 (Tex.Crim.App.1996). If the evidence in this case was insufficient to raise an issue of Barbour's guilt, there was no issue for the jury's resolution. *Id.* When conducting a legal sufficiency analysis, we review all of the evidence in the light most favorable to the verdict and determine whether any rational jury could find the essential elements of injury to a child as charged by the indictment beyond a reasonable doubt. *Hooper v. State,* 214 S.W.3d 9, 13 (Tex.Crim.App.2007); *Lacour v. State,* 8 S.W.3d 670, 671 (Tex.Crim.App.2000) (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Clewis,* 922 S.W.2d at 132–33; *Saxton v. State,* 804 S.W.2d 910, 914 (Tex.Crim.App.1991).

When reviewed in a light most favorable to a finding of guilt, C.S. testified Barbour gave him medicine which made him dizzy. Upchurch recounted Barbour's statements in jail that he gave someone morphine. Heartstill's toxicology report indicated morphine was given to C.S. around noon on the day C.S. was taken to the hospital by ambulance. According to Hurst, Barbour was left to take care of C.S. on that day. C.S.'s friend Sugg testified that Barbour was the only adult in the home when he went to visit and that Barbour attempted to wake C.S. up by squirting him in the face with a water bottle around 4:00 or 5:00 p.m. A rational jury could have found Barbour administered the morphine to C.S.

Heartstill stated "any morphine given to an eight year old is going to be a dangerous dose and could be lethal." Dr. Clark also concluded opiates could cause serious bodily injury, and Dr. Cox stated morphine given to an eight year old could be considered a deadly weapon.[FN2] Vrba and Cody described C.S. as being on the verge of death when he arrived in the PRMC emergency room. Dr. Clark explained that the morphine ingestion explained C.S.'s critical condition caused by respiratory failure. A rational jury could have found Barbour's administration of morphine to C.S. caused him serious bodily injury which created a substantial risk of death.

> FN2. Barbour does not contest the deadly weapon finding.

Finally, a rational jury could have determined Barbour administered the morphine to C.S. with awareness that his conduct was reasonably certain to cause C.S. serious bodily injury. Barbour's brief states "[t]here was no direct evidence that Mr. Barbour knew that morphine would cause serious bodily injury." Even putting aside common sense and the general knowledge of the hazards of morphine, Barbour's requisite culpable mental state can be inferred from surrounding circumstances, his acts, words, and conduct, and from the extent of C.S.'s injuries. *Patrick v. State,* 906

S.W.2d 481, 487 (Tex.Crim.App.1995); *Ledesma v. State,* 677 S.W.2d 529, 531 (Tex.Crim.App.1984); *Dunn,* 13 S.W.3d at 98–99. Here, C.S. described a pattern of physical injury and abuse by Barbour. Sugg testified he saw Barbour spraying a nonresponsive, "bluish" C.S. in the face with a water bottle around four or five o'clock in the evening. Despite Barbour's knowledge that C.S. was nonresponsive, he did not notify Hurst or call an ambulance. Instead, he waited several hours for Hurst to return home, find her son, and call an ambulance. A jury may reasonably infer that the defendant intentionally, not accidentally, inflicted an injury when he or she fails to render aid known to be needed. *Tezino v. State,* 765 S.W.2d 482, 485 (Tex.App.-Houston [1st Dist.] 1988, pet. ref'd).

The jury was also entitled to consider other abusive conduct toward the child by the defendant. *Id.* C.S. testified that Barbour had beaten him more than twenty times and committed other acts of violence toward him. C.S. was bruised on his face, neck, legs, scrotum, penis, buttocks, hip, and shins. The evidence established Barbour was not at the residence when the ambulance arrived. He also never arrived at PRMC emergency room. It was not until 5:30 the following morning that Barbour apeared at CMC. While there, nurses noticed that C.S. was uncomfortable around Barbour, whose explanations to officers about C.S.'s condition were not found plausible. C.S. told officers that Barbour warned him to conceal what had happened by expressing that the injuries were caused by a fall from a bicycle. After Boatwright interviewed C.S., Barbour left the hospital. A reasonable inference also arises in the presence of proof that the defendant tried to conceal the conditions that led to the victim's injuries. *Id.* We find that a rational jury could have determined Barbour knowingly gave C.S. the morphine when he was aware that his conduct was reasonably certain to cause the result of inflicting serious bodily injury on C.S.

Thus, we conclude the evidence was legally sufficient to find all elements of injury to a child as alleged in the indictment to support the jury's verdict.

## C. The Evidence Was Factually Sufficient to Support the Verdict

Unlike legal sufficiency review, we examine the evidence in a neutral light when assessing factual sufficiency and determine whether the proof of guilt is obviously weak as to undermine confidence in the verdict, or, if taken alone, is greatly outweighed by contrary proof so as to be clearly wrong and unjust. *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App.2003); *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App.2000); *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997); *Harris v. State,* 133 S.W.3d 760, 764 (Tex.App.-Texarkana 2004, pet. ref'd). A clearly wrong and unjust verdict is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997). Because factual sufficiency is an issue of fact, we are not free to reweigh the evidence and set aside the verdict merely because we feel a different

result is more reasonable. *Clewis,* 922 S.W.2d at 135.

The majority of contrary proof involved the defensive theory that Hurst administered the morphine and beat C.S.—including her access to morphine at her job and her admission to spanking C.S. with a belt three times a few days before. Since we have determined the evidence raised issues for the jury's resolution, we will not sit as the thirteenth juror re-evaluating the weight and credibility of the evidence. *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007); *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App.1999). Instead, we give full play to the jury's responsibility to weigh the evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic facts. *Johnson,* 23 S.W.3d at 7; *Clewis,* 922 S.W.2d at 133; *Bottenfield v. State,* 77 S.W.3d 349, 354 (Tex.App.-Fort Worth 2002, pet. ref'd) (citing *Jackson,* 443 U.S. at 319).

In reviewing all of the evidence in a neutral light, including Hurst's denial that she gave C.S. morphine, and C.S.'s testimony, we cannot say the evidence of Barbour's guilt was greatly outweighed by testimony reflecting the defensive theory. We find nothing unjust or shocking about the verdict and conclude the evidence was factually sufficient to support it.

*Barbour*, slip op. at 4-7. Petitioner's claim that the evidence is insufficient to support his conviction is simply a disagreement with the fact-finder's resolution of conflicts in the evidence, and as such, is foreclosed by settled principles of appellate review. *See United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999) (in reviewing sufficiency of the evidence, a court "must accept credibility choices that support the jury's verdict, and . . . may not reweigh the evidence."). Petitioner has not shown that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams,* 529 U.S. at 402-03, 120 S. Ct. at 1517-18; *Childress*, 103 F.3d at 1224-25. He has not shown that there was no reasonable basis for the state court to deny relief. *Richter*, 526 U.S. —, 131 S. Ct. at 784.

Because Petitioner has presented at least one unexhausted issue, he has filed a mixed petition.

While this petition could be dismissed in its entirety as a mixed petition, in the interest of justice, this court will examine Petitioner's exhausted claims.

Ineffective Assistance of Counsel at Trial

Petitioner claims that his trial counsel was ineffective for failing to request a jury instruction for the lesser-included offense of engaging recklessly in conduct causing serious bodily injury to a child. Specifically, he argues that there was some evidence suggesting that he acted recklessly.

<u>Legal Standard</u>

A petitioner who seeks to overturn his conviction on the grounds of ineffective assistance of counsel must prove his entitlement to relief by a preponderance of the evidence. *James v. Cain*, 56 F.3d 662, 667 (5th Cir. 1995). In order to succeed on a claim of ineffective assistance of counsel, a habeas corpus petitioner must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 2065, 80 L. Ed.2d 864 (1984). The standard requires the reviewing court to give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. *Id.* 466 U.S. at 690, 104 S. Ct. at 2066. The right to counsel does not require errorless counsel; instead, a criminal defendant is entitled to reasonably effective assistance. *Boyd v. Estelle*, 661 F.2d 388, 389 (5th Cir. 1981); *Rubio v. Estelle,* 689 F.2d 533, 535 (5th Cir. 1982); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984). Secondly, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Petitioner must "affirmatively prove," not just allege, prejudice. *Id.*, 466

17

U.S. at 693, 104 S. Ct. at 2067. If he fails to prove the prejudice component, the court need not address the question of counsel's performance. *Id.*, 466 U.S. at 697, 104 S. Ct. 2052. In the context of § 2254(d), the deferential standard that must be accorded to counsel's representation must also be considered in tandem with the deference that must be accorded state court decisions, which has been referred to as "doubly" deferential. *Richter,* 526 U.S. 86, 131 S. Ct. 770. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* "If the standard is difficult to meet, that is because it was meant to be." *Id.*, 526 U.S. —, 131 S. Ct at 786.

Discussion

Petitioner claims that his counsel was ineffective for failing to request a jury instruction on a lesser-included offense. However, the Fifth Circuit has consistently held that there is no constitutional right to an instruction on a lesser-included offense in a non-capital state trial. *Creel v. Johnson*, 162 F.3d 385, 390 (5th Cir. 1998); *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988); *Alexander v. McCotter*, 775 F.2d 595, 601 (5th Cir. 1985). A petitioner may not prevail in a federal habeas action simply by showing a violation of state law – they must show that the trial was fundamentally unfair, thus denying them due process by prejudicing the outcome of the trial. *Lavernia*, 845 F.2d at 496. Petitioner has failed in this regard. He has also failed to prove that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Even if the Texas two-step test were applied, Petitioner has not met his burden. He must have shown that the lesser-included offense was included within the proof necessary to establish the charged offense. Second, there must be evidence in the record that, if the defendant is guilty, he is guilty only of the

lesser-included offense. *Johnson v. State*, 623 S.W.2d 654, 657 (Tex. Crim. App. 1981). Petitioner appears to meet the first step, but he has failed to show that the record contains some evidence that would permit a jury rationally to find that he was guilty only of the lesser offense. *Hall v. State*, 225 S.W.3d , 524, 536 (Tex. Crim. App. 2007). He has failed to point to any evidence in the record to suggest that he is guilty only of recklessly administering morphine to C.S. Contrary to his assertions, the appellate court provided a detailed analysis of the evidence showing that Petitioner acted "with an awareness that his conduct was reasonably certain to cause serious bodily injury." *Barbou*r, slip op. at 11-12. In fact, the toxicologist testified that "any morphine given to an eight year old is going to be a dangerous dose and could be lethal."

Although there was some discussion between the attorneys prior to trial on the possibility of requesting a lesser-included offense instruction, it appears that Petitioner's counsel made a strategic decision not to request one – choosing to suggest that the victim's mother was responsible for the injuries rather than Petitioner. Petitioner has failed to meet his burden. Conclusory claims are insufficient to entitle a habeas corpus petitioner to relief. *United States v. Woods*, 870 F.2d 285, 288 (5th Cir. 1989); *Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982). Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions to be of probative value on a critical issue in his petition, unsupported and unsupportable by anything else in the record. *Ross v. Estelle*, 694 F.2d 1008, 1011-12 (5th Cir. 1983). Petitioner has not shown that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03; *Childress*, 103 F.3d at 1224-25.

19

## Ineffective Assistance of Counsel on Appeal

Petitioner also claims that his appellate counsel was ineffective.

## Legal Standard

The Fifth Circuit has held that to prevail on a claim of ineffective assistance of counsel on appeal, the petitioner must make a showing that had counsel performed differently, there would have been revealed issues and arguments of merit on the appeal. *Sharp v. Puckett*, 930 F.2d 450, 453 (5th Cir. 1991), *citing Strickland*, 466 U.S. at 687, 104 S. Ct. at 2065. In a counseled appeal after conviction, the key is whether the failure to raise an issue worked to the prejudice of the defendant. *Sharp*, 930 F.2d at 453. This standard has been affirmed by the Supreme Court. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed.2d 756 (2000) (holding that the petitioner must first show that his appellate attorney was objectively unreasonable in failing to find arguable issues to appeal, and also a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief raising these issues, he would have prevailed on his appeal). *See also Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed.2d 389 (2000); *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001).

Furthermore, an appellate counsel's failure to raise certain issues on appeal does not deprive an appellant of effective assistance of counsel where the petitioner did not show trial errors with arguable merit. *Hooks v. Roberts*, 480 F.2d 1196, 1198 (5th Cir. 1973). Appellate counsel is not required to consult with his client concerning the legal issues to be presented on appeal. *Id.* at 1197. An appellate attorney's duty is to choose among potential issues, using professional judgment as to their merits – every conceivable issue need not be raised on appeal. *Jones v. Barnes*, 463 U.S. 745, 749, 103 S. Ct. 3308, 3311-12, 77 L. Ed.2d 987 (1983).

<u>Discussion</u>

Petitioner asserts that his appellate counsel was ineffective because he advised him to forego the filing of a PDR in favor of a state application for writ of habeas corpus. Petitioner, however, has failed to present nothing more than his own conclusory claim that appellate counsel was ineffective. Conclusory claims are insufficient to entitle a habeas corpus petitioner to relief. *Woods*, 870 F.2d at 288; *Schlang*, 691 F.2d at 799. Petitioner raised this claim in his state writ of habeas corpus, referring to a letter in which his attorney allegedly made the statements, but he has not filed the letter as part of the record. Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions to be of probative value on a critical issue in his petition, unsupported and unsupportable by anything else in the record. *Ross*, 694 F.2d at 1011-12.

Moreover, a petition has no right to counsel on a PDR. *Ross v. Moffitt,* 417 U.S. 600, 610 (1974). The CCA has stated that, because there is no right to counsel on a PDR, appellate counsel has no duty to even advise the appellant of the merits of review. *Ex parte Wilson*, 956 S.W.2d 25, 27 (Tex. Crim. App. 1997). In *Wilson*, counsel informed appellant that he didn't believe a PDR would benefit him. After *Wilson*, an appellate attorney need not prepare a PDR for his client or even advise him of the merits or advisability of seeking such review in order to render constitutionally sufficient assistance of counsel. He must not neglect, however, to inform his client that he has the right to seek such review or in any way obstruct his client from doing so, by omission or commission. *See Ex parte Owen*, 206 S.W.3d 670, 673 (Tex. Crim. App. 2006) (discussing the Court's holding in *Wilson*).

In the instant case, it appears that appellate counsel for Petitioner was satisfying the requirements of *Wilson* – advising him that his appeal had been affirmed and that he had a right to

file a PDR. Moreover, Petitioner has wholly failed to show that appellate counsel's performance was deficient or that he was prejudiced by the alleged ineffectiveness. He has failed to prove that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

The CCA rejected this issue when it denied state habeas relief. Petitioner has not shown that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Williams*, 529 U.S. at 402-03, 120 S. Ct. at 1517-18; *Childress*, 103 F.3d at 1224-25. He has not shown that there was no reasonable basis for the state court to deny relief. *Richter*, 526 U.S. —, 131 S. Ct. at 784.

## Conclusion

Petitioner failed to properly exhaust one of his issues, and as a result, it is procedurally barred from federal habeas review. Further, he has failed to show that the evidence was insufficient. He also failed to show that there is a reasonable probability that, but for trial and appellate counsel's alleged unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In each of his claims, Petitioner has failed to show that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03, 120 S. Ct. at 1517-18; *Childress*, 103 F.3d at 1224-25. He has not shown that there was no reasonable basis for the

state court to deny relief. *Richter*, 526 U.S. —, 131 S. Ct. at 784. Accordingly, his petition should be denied and dismissed.

## Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Petitioner has not yet filed a notice of appeal, it is respectfully recommended that this court, nonetheless, address whether Petitioner would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed.2d 542 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id*.; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a

constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604.

It is respectfully recommended that reasonable jurists could not debate the denial of the Petitioner's § 2254 petition on procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 134, 154 L. Ed.2d 931 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is recommended that the court find that the Petitioner is not entitled to a certificate of appealability as to the claims raised.

## Recommendation

It is therefore recommended that the petition be denied and dismissed with prejudice. It is further recommended that a certificate of appealability be denied.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)( C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superceded by statute on other grounds*, 28 U.S.C. § 636(b)(1)

(extending the time to file objections from ten to fourteen days).

**SIGNED this 2nd day of September, 2014.**


_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE